```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA        *    Case No. 20-CR-0052(EK)
                                *
                                *    Brooklyn, New York
                                *    April 8, 2022
        v.                      *
                                *
ORLANDO LOPEZ,                  *
                                *
             Defendant.         *
                                *
     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

                TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
                  BEFORE THE HONORABLE EDWARD R. KOMITTEE
                      UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:              TANYA HAJJAR, ESQ.
                                 Asst. United States Attorney
                                 United States Attorney's Office
                                 271 Cadman Plaza
                                 Brooklyn, NY 11201


For the Defendant:               MICHELLE A. GELERNT, ESQ.
                                 Federal Defenders of New York
                                 One Pierrepont Plaza, 16th FL
                                 Brooklyn, NY 11201


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 2:37 p.m.)

2          THE CLERK:  Criminal cause for sentencing, the

3    United States of America versus Orlando Lopez, docket number

4    20CR52.  Would you all please state your appearances for the

5    record, starting with the government?

6          MS. HAJJAR:  Good afternoon, Your Honor.  Tonya

7    Hajjar for the government.  I'm jointed by Special Agent

8    Aaron Steeva (ph) of the FBI and Jennifer Fisher of the

9    United States Probation Department.

10         MS. GELERNT:  Good afternoon, Your Honor.

11         THE COURT:  Good afternoon.  You can all stay

12   seated while speaking.  The important thing is that we're

13   close enough to the microphones here for the sound recording,

14   but good afternoon.

15         MS. GELERNT:  Good afternoon, Your Honor.  Federal

16   Defenders by Michelle Gelernt -- G-E-L-E-R-N-T, along with

17   Elba Torres Perez of the Federal Defenders, a mitigation

18   specialist and seated also at counsel table with Mr. Lopez.

19         THE COURT:  Good afternoon.

20         Okay.  So we are --

21         THE CLERK:  I'm sorry, Judge, we're joined by in-

22   house Spanish interpreter Mario Michelena, previously sworn.

23         THE INTERPRETER:  Good afternoon, Judge.

24         THE COURT:  Good afternoon.  All right.  We are

25   here for sentencing in this case as you all know.  We are, as

1    Ms. Guy just noted, proceeding with the assistance of an

2    interpreter.

3            Mr. Lopez, it's important that you understand

4    everything that is said here today, and if you need anything

5    repeated or re-translated, please don't hesitate to speak up

6    at any point and let us know that you missed something and we

7    will make sure to repeat whatever is needed.

8            THE DEFENDANT:  Thank you, Judge.

9            THE COURT:  Okay.  So Mr. Lopez pleaded guilty

10   before me in this case to ten counts in the indictment.  And

11   let me invite the government to speak up if I get anything

12   wrong here.

13           This is a relatively complicated set of counts and

14   guidelines calculations and statutory provisions and the

15   like, and so as always, I invite feedback.

16           The counts of Mr. Lopez's conviction are counts 2,

17   4, 5, 6, 7, 8, 9, 10, 11, and 12.  That is all of the counts

18   in the indictment except for counts 1 and 3, correct?

19           MS. HAJJAR:  That's correct, Your Honor.

20           THE COURT:  Okay.  And just for the sake of the

21   clarity of the audio recording, I'm going to remove my mask.

22   I'm up here behind the plexiglass and fully vaccinated.  If

23   anybody else wants to do the same, let me know and we'll talk

24   about where you're seated and who you're seated next to and

25   whether that's appropriate.

4

1          Let me remark as we begin that it was important to

2     me and to the parties at the guilty plea proceeding to make

3     sure that the record was clear that when we talked about the

4     victims in this case by reference to their pseudonyms, that

5     we knew that we were all on the same page as to which victim

6     we were talking about in connection with which count.

7          That is, of course, important again today and so at

8     my request the government has provided a chart that sets

9     forth in a series of columns the pseudonym by which each

10    victim is referred to in the indictment and other operative

11    documents, the true name of that victim, their date of birth

12    to the extent it's known, their age at the time that they

13    were victimized by the relevant crime of conviction, the

14    number of images of them recovered in the forensic analysis

15    here, and the number of videos to the extent we're talking

16    about video evidence.

17         And for obvious reasons relating to the

18    confidentiality of the victims identities, I'm going to ask

19    the defense to return their copy of this document after

20    today's proceeding to the government for shredding.

21         I know the defense already knows the identities of

22    these victims, I just don't want these pieces of paper

23    floating around, but I will mark for identification, my copy

24    of this chart as Court's Exhibit 1.

25         MS. GELERNT:  Your Honor, just regarding, that,

5

1    I've had conversations with government counsel and as the

2    court is aware, there is a state case unrelated charges and

3    I've sought to be able to provide this chart to state court

4    counsel upon state court counsel's execution of the

5    protective order that exists in this case.  And government

6    counsel indicated that that was acceptable.

7            I think it's important that the counsel in the

8    state case as well as the judge in the state case understand

9    exactly what conduct Mr. Lopez was convicted of here since

10   there is overlapping conduct and overlapping victims in the

11   state matter.

12           THE COURT:  Yeah, I see the interest obviously in

13   the state court for double jeopardy or other purposes

14   understanding what conduct Mr. Lopez was convicted of in

15   connection with what counts in this case.

16           I had not considered wider distribution than just

17   those of us gathered here today, and so I think my position

18   now is that it's fine with me if it's fine with the

19   government.  But if you want to be heard further on that, let

20   me know.

21           MS. HAJJAR:  Yes, Your Honor.

22           I just indicated to Ms. Gelernt that I would prefer

23   if defense counsel in the state court proceeding assignee to

24   the protective order Your Honor has entered.  There is room

25   for the option should defense counsel wish to share

1    information produced pursuant to the protective order.

2         So we'd just ask defense counsel to have state

3    defense counsel sign on formally so that he is subject to the

4    strictures of the protective order in this case.

5         THE COURT:  Right.  And presumable a copy of his

6    signature page for the agreement transmitted to the

7    government before the --

8         MS. HAJJAR:  Disclosure.

9         THE COURT:  -- disclosure occurs.

10        MS. HAJJAR:  Yes, Your Honor.

11        THE COURT:  Okay.  I think we're all on the same

12   page there.

13        Okay.  So Mr. Lopez, let me before we formally

14   begin here, just explain the process for today's proceeding.

15        First, I will say a word about the crimes of

16   conviction, what counts relate to what statutes.

17        Second, I want to list on the record every

18   submission that I have received and considered in preparation

19   for today.

20        The purpose of that is to make sure that I have

21   received everything the parties think I should have and that

22   we're all working off the same information.

23        Next, we will discuss the pre-sentence report put

24   together by the Probation Department as well as the addendum

25   to that report and I know that there have been objections

7

1     along the way from the defense.  We'll talk about those as

2     well.  And when I say the pre-sentence report in the context,

3     I'm talking about the narrative recitations of the pre-

4     sentence report.

5            We will also go over the guidelines calculation in

6     the PSR.  I think you know from your guilty plea hearing,

7     that the United States Sentencing Guidelines are now

8     advisory, meaning that I am not obligated to sentence within

9     the guidelines range.

10           Nevertheless, it is still my obligation to

11    determine what the guidelines range is and to consider the

12    guidelines before imposing sentence, as well as any

13    departures from the guidelines that might apply.

14           After that, after we all have agreement on what the

15    guidelines range is for the offenses in this case, I will

16    give the attorneys an opportunity to make any arguments they

17    wish to make and following that, Mr. Lopez, you will have the

18    right, but not the obligation, to make a statement to the

19    court if you wish before I impose a sentence.

20           Once all of that has happened, I will most likely

21    take a ten minute break to collect my thoughts and then we

22    reconvene, I will review what we call the section 3553(a)

23    factors.

24           Those are the factors that congress in federal

25    sentencing law has required me to consider in order to

8

1    determine the appropriate sentence in this case.  They

2    include things like the personal history of the defendant,

3    the offense conduct at issue and other factors that we will

4    discuss.

5              After reviewing those factors, I will impose

6    sentence.  Mr. Lopez, do you understand the process I've laid

7    out here?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Okay.  Does the government -- I have

10   the government's submission that includes various victim

11   impact statements.

12             Is there anybody the government has with you in the

13   courtroom asking to be heard live today?

14             MS. HAJJAR:  No, Your Honor.  I will just say that

15   one victim family member has asked me to read a portion of

16   the statement that was submitted that was already submitted

17   to Your Honor.  With your permission I will do so, but

18   otherwise, I don't expect the victim will be here today to

19   address the court today.

20             THE COURT:  Okay.  Yes, I will be happy to give you

21   that opportunity.

22             So turning to the guilty plea, the crimes of

23   conviction here, Mr. Lopez pleaded guilty before me on July

24   26th of last year to the counts I mentioned before.

25             Count 2 charged sexual exploitation of a child on

9

1    March 10th of 2011.  Count 4 charges the same on February 5th

2    -- excuse me, February 15th of 2012.  Count 5 the same sexual

3    exploitation of a child on June 24th, 2013.  Count 6, the

4    same on May 12th, 2015.  Count 7, the same on July 29th,

5    2017.  Count 8, the same on August 9th, 2017.  Count 9, the

6    same on March 23rd, 2018.  Count 10, the same on August 2nd,

7    2019.  Count 11, the same on August 21st, 2019.

8            So those are nine counts alleging sexual

9    exploitation of various children beginning with count 2 in

10   2011 and continuing through count 11 in 2019.

11           Count 12, to which Mr. Lopez also pleaded guilty,

12   charged possession of child pornography.

13           The sexual exploitation charges that I listed,

14   relate to violations of 18 U.S. Code, Section 2251 and the

15   last count of possession of child pornography a violation of

16   18 U.S. Code, Section 2252.

17           And I'll talk in a bit about the minimum and

18   maximum punishments associated with each of those provisions.

19           In terms of the documents in my possession, I have

20   the pre-sentence report filed on January 4th, 2022, the

21   Probation Department's initial sentence recommendation dated

22   January 4th, and a revised sentence recommendation also from

23   the probation department, dated March 23rd.

24           Does the defense have the Probation Department's

25   sentence recommendations?

1            MS. GELERNT:  Your Honor, I believe, I'm not sure

2     that I received the second recommendation.  I received an

3     addendum, but I don't know if there's a second document.

4            THE COURT:  Okay.  It is my practice to put the

5     recommendations from the Probation Department on the record

6     at sentencing.  I do that because even though, of course,

7     those recommendations are not binding on me, they are

8     important in my thought process.

9            The Probation Department sees every defendant

10    sentenced in this district and they have more context

11    regarding the way court sentences various defendants for

12    various crimes than any individual judge in this building

13    does and because I consider that recommendation, I think it's

14    only fair that I share it with the parties and I will do so

15    today.

16           There is an addendum to the PSR that Ms. Gelernt

17    just mentioned, dated March 18th, 2022.  That was dealing

18    with a purported 1997 conviction and 30 month sentence, 3-0

19    month sentence in Columbia.

20           It dealt with a guilty plea that was entered and

21    then vacated in New York State Court that dealt with some of

22    the conduct either charged in or overlapping with this case

23    and we'll talk about that a little bit as well.  And it

24    contained an employment history update regarding Mr. Lopez.

25           I have the defendant's sentencing memorandum dated

11

1    March 11th, 2022.  I have the government's memorandum dated

2    March 25th, 2022, and I have one document containing a series

3    of victim impact statements provided by the government.  I

4    don't think that that document has a date on it, but it is

5    five pages long.

6              Is that all the victim impact statements I should

7    have in this case?

8              MS. HAJJAR:  Yes, Your Honor.

9              THE COURT:  Okay.  Is there anything else from the

10   government's perspective that I should have?

11             MS. HAJJAR:  No.  Thank you, You Honor.

12             THE COURT:  Anything else from the defense

13   perspective?

14             MS. GELERNT:  No, Your Honor.  Thank you.

15             THE COURT:  Okay.  All right.  So we are all

16   working off the same information here.

17             Ms. Gelernt, have you and your client read and

18   discussed the pre-sentence report in this case?

19             MS. GELERNT:  We have, Your Honor.

20             THE COURT:  And have you had a sufficient

21   opportunity to discuss any issues?

22             MS. GELERNT:  Yes, Your Honor.

23             THE COURT:  Putting aside the guidelines

24   calculations, do you have any unresolved objections to the

25   PSR at this point?

1      MS. GELERNT:  No, Your Honor.  I think Probation

2   has responded.  Whether or not we're in agreement regarding

3   the factual dispute, is a separate matter.  But I don't think

4   there's anything else that hasn't been addressed.

5      THE COURT:  Okay.  So no factual disputes that

6   you're looking for me to resolve with respect to the

7   guidelines?

8      MS. GELERNT:  No, Your Honor.

9      THE COURT:  All right.  I will say in respect of

10  Probation's reference to a 1997 conviction on corruption

11  charges in Columbia, it does seem odd to me that it's

12  possible that that could happen and the defendant not

13  remember serving 30 months incarceration for corruption, but

14  I don't believe I need to resolve that because it will not

15  affect my views on sentencing here today one way or the

16  other.

17     MS. GELERNT:  Your Honor, I guess I should clarify.

18  I believe originally in the pre-sentence report it didn't

19  necessarily specify the sentencing.  There was an issue when

20  Mr. Lopez was in (phone ringing) -- I apologize --

21     THE COURT:  That's okay.

22     MS. GELERNT:  -- when Mr. Lopez was in Columbia

23  where his identification was stolen and where there was an

24  ongoing issue about that.  But I don't want to -- we're not

25  asking for a *Fatico* hearing on that.  Given that it's over 25

13

1    years ago and the court has already indicated that it doesn't

2    intend to factor that into it's sentencing analysis here, I

3    don't think it is wise to belabor it.

4              THE COURT:  Yeah, I confirm, it's irrelevant to the

5    determination on sentencing that I will make today.

6              MS. GELERNT:  Thank you, Your Honor.

7              THE COURT:  Okay.  And I take it neither party is

8    seeking an evidentiary hearing on any issue?

9              MS. GELERNT:  No, Your Honor.

10             MS. HAJJAR:  That's correct, Your Honor.

11             THE COURT:  Okay.  All right.  Turning then to the

12   sentencing guidelines.  Are we all in agreement that the

13   sentencing guidelines calculation laid out in the

14   government's sentencing submission is the correct one?

15             You lay out in your sentencing submission a count

16   by count application of the sentencing guidelines.  You then

17   total them, the total and the aggregation analysis yield a

18   guidelines range of life, which is not really a range.

19             We all agree I think that no individual count of

20   conviction permits a life sentence on that one count and,

21   therefore, the guidelines are largely beside the point here

22   today even though, of course, I will consider them on a count

23   by count basis.

24             But just in terms of whether the individual

25   calculations for each count are accurate, I take it we don't

14

1      have a dispute over the submission that the government made,

2      is that correct?

3              MS. HAJJAR:  Really not from the government.  This

4      calculation differs slightly from the calculation that was

5      set forth in the plea agreement, but the government agrees

6      with Probation's analysis and believes the base offense level

7      of 51, that's taking into account all the grouping analysis

8      and the way the guidelines work for multiple victims is

9      correct.

10             So that leads us -- that's off the charts, that

11     leads us to a 43 offense level which corresponds to a

12     guidelines term of life imprisonment.

13             THE COURT:  Okay.  Ms. Gelernt, do you agree with

14     that assessment?

15             MS. GELERNT:  Yes, Your Honor, but I think as the

16     court pointed out, essentially because the guidelines are at

17     life and none of the statutes of conviction carry a

18     possibility of an actual life sentence, the effective

19     guideline range becomes multiples of the maximums for each

20     count of conviction which I think is how probation analyzed

21     it, if that makes sense.

22             THE COURT:  Okay.  I think we're all on the same

23     page.

24             MS. GELERNT:  Correct.

25             THE COURT:  And I think one implication of us all

1    being on the same page is that we don't have to go through

2    the guidelines calculation for any count to resolve any

3    disputes about how the guidelines would apply to that count

4    individually, correct?

5              MS. GELERNT:  Correct, Your Honor.

6              MS. HAJJAR:  That's correct, Your Honor.

7              THE COURT:  Okay.  All right.  So is there anything

8    Probation wants to add on that subject? I'm not sure anything

9    is necessary, but let me just give you the opportunity?

10             THE PROBATION DEPARTMENT:  No, Your Honor, that's

11   accurate.  Thank you.

12             THE COURT:  Thank you.  Okay.  So we mentioned that

13   the guidelines, as well, the defendant is in criminal history

14   category 1, that's predicated on a criminal history score of

15   zero points.  The guidelines range for each offense we just

16   took up.  The guidelines range for supervised release is five

17   years per count, correct?

18             MS. HAJJAR:  A minimum of five years, so yes, the

19   guideline range would be five year to life on each count.

20             THE COURT:  Right.  And we'll talk about the

21   statute in a minute as it relates to the supervised release.

22             Probation's recommendation was initially that on

23   count 2 and counts 4 through 11, I sentence the defendant to

24   50 years, 5-0, in the custody of the attorney general on each

25   count, all to run concurrently.  That was predicated on

1    Probation's original understanding of the statutory maximum

2    which apply to higher statutory maximum in recognition of the

3    state court conviction for sexual exploitation that relates

4    to some of the same conduct in this case.

5         I think everybody now acknowledges that that

6    conviction has been vacated and, therefore, should not affect

7    the statutory maximum and in recognition of that agreement,

8    Probation's revised sentence recommendation recommends that

9    on count 2 I sentence Mr. Lopez to 20 years in the custody of

10   the attorney general to run consecutively to all other counts

11   and that on counts 4 through 11, Mr. Lopez be sentenced to 30

12   years in the custody of the attorney general.  Those counts 4

13   through 11 to run concurrently to each other and to count 12,

14   but consecutively to the 20 years in count 2.

15        So essentially a 50 year total for counts 2 through

16   11 -- or 2 and 4 through 11.  And on count 12, five years in

17   the custody of the attorney general to run consecutively to

18   the sentence on count 2 and concurrently to counts 4 through

19   11.      And so I think when you stack those, if I

20   understand what Probation is doing, you end up with a total

21   sentence of 50 years.  Is that correct?

22        THE PROBATION DEPARTMENT:  That is correct, Your

23   Honor.  Our position really is that although the statutory

24   requirements have changed, the underlying facts of the case

25   have not.  So our actual recommendation remains unchanged.

1    We just had to sort of change the mechanisms of how we

2    recommend you impose it.

3            THE COURT:  Understood.  Probation also recommends

4    five years supervised release on each count all to run

5    concurrently and a number of special conditions of supervised

6    release that we will talk about later in this proceeding.

7            Okay.  So in terms of the statutory provisions,

8    we've talked a little bit already, we all agree now that on

9    count 2 and counts 4 through 11, the mandatory statutory

10   minimum is 15 years, 1-5, for each of those counts and

11   there's a maximum -- statutory maximum of 30, 3-0, years on

12   each of those counts under 18 U.S. Code, Section 2251(e).

13           Count 12, the child pornography count has no

14   mandatory minimum and a statutory maximum penalty of ten

15   years under 18 U.S. Code, Sections 2252(a)(4)(b) and (b)(2).

16           The maximum fine by statute is $250,000 on each

17   count under 18 U.S. Code, Section 3571(b) and in addition to

18   the mandatory $100 special assessment on each count, which is

19   $1,000 total special assessment under 18 U.S. Code, Section

20   3013, there are statutory -- specific statutory special

21   assessments in the statutes of conviction in this case that

22   we will also consider later.

23           The Justice for Victims of Trafficking Act of 2015

24   calls for an assessment of $5,000 per count on any non-

25   indigent person who's convicted of the crimes at issue here,

1    I believe.

2         And on Count 12, the government is going to correct

3    me if I'm getting any of this wrong, on count 12 the

4    defendant is subject to the provisions of the Amy, Vicky, and

5    Andy Child Pornography Victim Assistance Act of 2018 which

6    provides that in addition to other special assessments

7    authorized by law, I shall assess not more than $17,000.

8         Additionally, under 18 U.S. Code, Section 2254 -- excuse

9    me, 2252(a)(4) and not more than $35,000.  And to the extent

10   the offense involves the production of child pornography, the

11   special assessment can be as high as $50,000.

12        I think the special assessment provisions that I'm

13   talking about now may be academic in this case, given the

14   fact that Mr. Lopez has no assets to speak of according to

15   the pre-sentence report and obviously given the priority of

16   restitution to the victims over any special assessment that

17   would be paid to the government.  Is that correct?

18        So we will impose, of course, the mandatory $100

19   special assessment for each of the ten counts of conviction.

20        Are any of the other special assessments that I've

21   just discussed mandatory by operation of statute or does the

22   indigence remove the obligation to impose those assessments?

23        MS. HAJJAR:  If I could just have one moment to

24   confer with Probation, Your Honor?

25        THE COURT:  Yeah, please.

1            MS. HAJJAR:  Your Honor, I wanted to confirm with

2     Probation about the TVPA's $5,000 assessment.  I was under

3     the impression it was mandatory, but as Probation points out

4     in the PSR, this is paragraph 171, it is the court shall

5     assess an amount of $5,000 on any non-indigent party.

6            And so with the court's finding that Mr. Lopez is

7     indigent, given what's in the PSR, I think the only mandatory

8     assessments are the $100 per count.

9            THE COURT:  Okay.  So there will be $1,000 total of

10    special assessments imposed as part of sentence here and the

11    additional statutory assessments, Mr. Lopez will not be

12    subject to, given the indigence finding and the restitution

13    that we're contemplating.

14            MS. HAJJAR:  That's correct, Your Honor.

15            THE COURT:  Okay.  And then turning to restitution,

16    my high level question here is whether we are going to

17    resolve the restitution issue today or whether we should use

18    the 90 days that are accorded to us by statute, to make sure

19    we have everything we're going to get on restitution.

20            My instinct is the latter, that we should see if

21    anything else comes -- I know you've made attempts to reach

22    out to other victims.  It's possible that other victims will

23    reach out to you, especially if there's some publicity

24    associated with today's proceeding. I don't know.  It seems

25    to me there's no reason to resolve restitution today and we

1  can take it up sometime in the next three months.

2          MS. HAJJAR:  That's right, Your Honor.  I would say

3  the court could order the $24,000 that is currently requested

4  by the victims of the possession of child pornography that

5  was based on the request previously submitted by those

6  victims.

7          The government has not yet received restitution

8  requests from the victims of the production counts.  I would

9  ask that the court leave open the possibility of so imposing

10  such restitution orders within the next 90 days so that if

11  victims were to put forward restitution requests, we could

12  convey those to counsel and the court.

13          THE COURT:  Okay.  So this is the -- there are one,

14  two, three, four, five, six, seven -- seven victims

15  identified by pseudonyms as victims depicted in series of

16  child pornography that are identified as Blues Pink 1,

17  Cinderblock  Blue, Jenny, Jessica, Misty and the last series

18  identifier is all one word, Teal&pinkprincess2, is that who

19  we're talking about here?

20          MS. HAJJAR:  Yes.  I believe it's eight -- I have

21  it as eight victims if that's not correct.  I think that's

22  based on victim Tara that's referred to in paragraph 44 and

23  that is included in the $24,000.  Probation calculated $3,000

24  for each victim.

25          THE COURT:  Oh, I see.  And does Tara need to be

1    associated with a particular series?

2              MS. HAJJAR:  That is a series, Your Honor.  I think

3    it's a Tara series.

4              THE COURT:  Oh, okay.

5              THE PROBATION DEPARTMENT:  That's correct, Your

6    Honor.

7              THE COURT:  And, I'm sorry, remind me of what

8    paragraph in the PSR you just said?

9              MS. HAJJAR:  It's paragraph 44.  Probation notes

10   that the victim depicted in the Tara series also included a

11   claim to restitution.  And so has asked for restitution in

12   connection with that victim as well.

13             THE COURT:  Okay.  And Ms. Gelernt, if I were to

14   proceed in that fashion, specifically by ordering restitution

15   today in those amounts for those eight victims and then to

16   the extent any other victims are identified, we take that up

17   at some point in the next 90 days, is that something the

18   defense wants to be heard on?  I think you -- is there an

19   agreement on restitution?

20             MS. GELERNT:  Your Honor, I don't think that we're

21   going to challenge restitution at this point.  I think at

22   some point it's somewhat academic given the likely sentence

23   for Mr. Lopez and his inability to pay.

24             I think what we're really talking about is a

25   portion of his commissary being conscripted while he's in.

22

1     So I don't have an objection.  I know that *Paroline* asked the

2     court to actually consider whether or not victims are

3     obtaining restitution sort of endlessly that's going beyond

4     what actually serves as restitution, but we're not going to

5     objection if the court proceeds in that way.

6              THE COURT:  Was that a case name that you just

7     invoked?

8              MS. GELERNT:  Yeah.

9              THE COURT:  Spell it for me?

10             MS. GELERNT:  P-A-R-O-L-I-N-E, it's the case that

11     stands for the proposition that restitution must be related -

12     - proximately related to the harms caused by each individual

13     victim and so in the government's view and in Probation's

14     view, I believe, these $3,000 amounts per victim do represent

15     what was the harm that was proximately caused to that

16     particular victim based on the number of images possessed by

17     the defendant.

18             The actual damages each of those victims have asked

19     for are far in excess of -- in total, I mean, of all

20     offenders possessing images of course, far in excess of the

21     amount requested for each individual offender.

22             THE COURT:  Right.  And if the numbers are fixed

23     today, I don't understand how we have the issue that defense

24     counsel invoked about restitution being paid in perpetuity.

25     It's only going to be paid in perpetuity to the extent it

1    just hasn't been paid off.  But it's not a moving target --

2              MS. GELERNT:  No, no.  I'm sorry, and perhaps I

3    shouldn't have said anything since we're not going to

4    actually object.

5              The idea or one of the ideas behind it is if at a

6    certain point if there is -- since restitution has to be

7    linked to actual harm and causation, if there are numerous

8    and numerous defendants each paying $3,000 as it actually

9    serving to go towards the causation of harm or at some point

10   has the victim been compensated for the harm, is the idea.

11   So if he harm -- I mean it's hard to ever associate a dollar

12   amount with the harm that he's caused --

13             THE COURT:  Right.

14             MS. GELERNT:  -- but if he were to pay --

15             THE COURT:  But from a theoretical perspective,

16   isn't it the case that each viewing is a new instance of harm

17   at least arguably?

18             MS. GELERNT:  That's the government's perspective

19   at a certain point and nobody actually ever and I think there

20   are much greater issues here today and I know Mr. Lopez is,

21   you know, extremely anxious to just move forward.

22             The idea is if somebody had assessed that the

23   victim should receive a million dollars in pain and suffering

24   for the damage that was caused, at a certain point if nobody

25   is looking at how many people have been ordered to pay $3,000

24

1    or $5,000 in restitution, it can actually, the individual

2    restitution amounts can actually total more than the amount

3    of damage, was part of the idea.

4            Nobody is actually looking at itemizing what was

5    the harm caused through any sort of actuarial analysis.  But

6    we're not objecting, we're not going to take the position,

7    and by the terms of our plea agreement, we agreed to the

8    guidelines range on -- and things like that.

9            But so this is sort of -- while it's significant,

10   it's the least significant affect of the sentence the court

11   will impose today on Mr. Lopez, so I don't want to belabor it

12   more than I already have probably unnecessarily.

13           THE COURT:  Okay.  No, it's fine.  But so where we

14   are coming out on this is that to the extent I'll be ordering

15   $24,000 in restitution to those eight victims today, there is

16   no objection.

17           MS. GELERNT:  There is no objection.  That's

18   correct.

19           THE COURT:  Okay.

20           MS. GELERNT:  And we would just ask that when there

21   are -- if there are additional claims, we receive notice of

22   that in case there is some objection to it.

23           THE COURT:  Understood.  Okay.  So that takes us

24   through the PSR, the application of the guidelines and the

25   statutory punishment provisions at issue.

1          As I mentioned earlier, I have reviewed the parties

2     written sentencing submissions which I thought were very

3     comprehensive all around.

4          Ms. Galernt, do you wish to be heard further at

5     this time?

6          MS. GELERNT:  Yes, Your Honor.  Thank you.  As the

7     court is aware by terms of our plea agreement, we're

8     constrained not to request a downward variance below 25 years

9     however the court were to arrive at that number.

10         And for the purposes of this application, I'm just

11    going to talk about the sentence in terms of an aggregate

12    number rather than specifically as to each count because I

13    think that's really at the heart of the matter, what the

14    total sentence will be.

15         I know that the court is aware that it has the

16    power to sentence Mr. Lopez to a minimum of 15 years.  The

17    government has requested a life sentence and I believe the

18    total maximum sentence in this case given what everybody has

19    agreed on, on the maximum penalties, is I believe 280 years,

20    If I'm calculating correctly.

21         But given Mr. Lopez's age, there is a fact that

22    even a mandatory minimum sentence could end up being a life

23    sentence.  He's 66 years old now and even a 15 year sentence

24    would result in him being incarcerated until he's about 80.

25         The first point that we addressed in our sentencing

26

1    memorandum, was Mr. Lopez's acceptance of responsibility.

2    And we submitted to the court that Mr. Lopez has actually

3    shown an extraordinary acceptance of responsibility in this

4    case, and actually not just in this case, but in the state

5    case as well.

6              As the court is aware, in that case Mr. Lopez

7    actually waived a grand jury presentation and pled guilty

8    rather quickly to a sentence that -- the promised sentence

9    was 19 years.

10             And here Mr. Lopez accepted a plea agreement where

11   he couldn't ask for less than 25 years meaning the earliest

12   he would have hoped to be released would at approximately 90.

13   With the understanding that if the court were to impose a

14   sentence well in excess of life, he would be constrained and

15   not be permitted to appeal.

16             So I do think that shows and extraordinary

17   acceptance of responsibility on his part and I don't think

18   the fact that through the advice of counsel, he vacated the

19   state court pleas which were interrelated, negates that.

20         This was a very difficult choice even for me as an

21   attorney to advise somebody to accept a plea knowing that the

22   government would come in and ask for the equivalent of a life

23   sentence and knowing that given the nature of the crimes, the

24   court might find itself wrestling with that.

25             I think Mr. Lopez's acceptance of responsibility

1    warrants a downward variance not just because it's about him

2    and his reflection on the seriousness of the crime, but also

3    because of what it says to other similarly situated

4    defendants and defense counsel.

5              I think one of the concepts we're familiar with in

6    this courthouse when we're dealing with something that I

7    would suggest is somewhat analogous to this situation is

8    cooperators who are being sentenced pursuant to 5K motions

9    where the government is asking for downward departures from

10   statutory minimums, mandatory minimums, or from guidelines

11   ranges.

12             And one of the reasons the court grants a downward

13   variance or downward departure in that circumstance, is not

14   just because of that the defendant in that situation should

15   receive a benefit from being willing to come forward and

16   assist the government, but that it would encourage other

17   people to do so as well in the future with the understanding

18   that justice is administered more fairly or more equitably

19   when more people are willing to cooperate.

20             I think that's true for these types of cases.  Mr.

21   Lopez by his plea, has spared the victims from going through

22   a protracted trial.

23             If we, as Your Honor just referenced, agree that

24   every viewing of child pornography is an additional harm, Mr.

25   Lopez has spared the victims in this case, the additional

28

1    harms that would come from the child pornography being played

2    again for members of the community and jurors and sitting

3    through that trial.

4             So I think that in and of itself is worthy of a

5    downward variance, but I also think it's important that

6    similarly situated defendants understand that there is some

7    benefit to accepting responsibility to pleading guilty even

8    when the best they can hope for, may be the equivalent of a

9    life sentence for Mr. Lopez.

10            So somebody else making this choice might also see

11   that the court was aware that they spared the victims harm

12   and did actually show compassion or adjust their sentence

13   accordingly and it might encourage future defendants and

14   certainly future defense counsel to advise their clients to

15   take a plea as well in this situation.

16            I think one of the things we grappled with or I

17   grappled with in trying to discuss what an appropriate

18   sentence is for the court, is that in no way do we want to

19   diminish the serious nature of the crimes here, or what the

20   victims suffered.

21            I think there is no way to diminish that, there's

22   no way to minimize the seriousness of the conduct especially

23   protracted harm that occurred over many years.

24            That being said, the seriousness of the offense and

25   the need for punishment are not the only matters the court

1     has to consider.

2              I also do want to emphasize as I did in my

3     submission, that in this case there is a practical difference

4     between, and a real life difference, between sentencing Mr.

5     Lopez to the maximum or 280 years as the government will ask

6     for, since a life term is not available, and sentencing Mr.

7     Lopez to a number that may actually turn out to be the

8     equivalent of his natural life, but is say the 25 years we're

9     constrained to ask for.

10             And we discussed one of those differences in our

11    submission and that is that the way the bureau of prisons

12    structures designations is that if the court were to give Mr.

13    Lopez a sentence of say 100 years or 200 years, he would be

14    designated to a maximum security facility according to BOP

15    regulations.

16             I think the parties may dispute whether or not Mr.

17    Lopez would be a danger released to the community in terms of

18    even if he were 80 or 90 years old, but I don't think there

19    can be any real dispute that while incarcerated he presents

20    no danger.

21             He's been incarcerated now actually since October

22    of 2019 because he was originally arrested in the state and

23    he was brought into federal custody in February of 2020,

24    shortly before the onset of the pandemic.

25             So he's now been incarcerated at the MDC for over

1    two years without incurring any type of disciplinary

2    infraction.  He's one of the few detainees who actually found

3    some productive programming to participate in.

4            So I don't think anybody really has a concern that

5    while incarcerated, Mr. Lopez presents a danger such that it

6    would be necessary to house him in one of the most secure

7    facilities available.

8            I also discussed that one of the other factors the

9    court has to consider is the need for educational,

10   vocational, or correctional treatment.

11           I think in these types of cases what we often talk

12   about in terms of the need for correctional treatment, is sex

13   offender treatment while in custody.

14           In my research the only facility that offered that

15   as a high security facility, was the facility in Tucson which

16   would cause substantial hardship to not only Mr. Lopez, but

17   his family.

18           As the court is aware he has family local here in

19   addition to the family in Queens who would be unable to visit

20   him if he were designated to Tucson.

21           We are going to ask that the court designate Mr.

22   Lopez or recommend the designation to Butner in North

23   Carolina which is actually -- it has a medical facility which

24   can treat not only Mr. Lopez's current medical needs, but the

25   reality of somebody aging in prison is that they're likely to

1    have increased medical needs and Butner has not only a sex

2    offender treatment program, but it's attached to a federal

3    medical center and there's a minimum and medium facility all

4    within the same complex of prisons.  So we do believe that

5    would be appropriate.

6              So I think the need for correctional treatment some

7    place where his family could visit, also mitigates in favor

8    of sentencing Mr. Lopez to something more in the range of

9    what we are constrained to ask for.

10             The other issue in terms of sentencing him to

11   hundreds of years or 50 years, is that Mr. Lopez will have no

12   ability to be stepped down from levels of security.

13             So as we noted in our sentencing submission, if

14   somebody is a deportable, non-citizen, the security factors

15   can't be waived.

16             And you have to have under 30 years left on a

17   sentence to get moved from a maximum to a medium and then

18   under 20 years to get moved to a low level facility.

19             So with a sentence of the nature that the

20   government will ask for even that Probation is going to ask

21   for, it is unlikely that Mr. Lopez would ever even find

22   himself at the time frame where he could be stepped down in

23   the levels of security.

24             If he were to be sentenced to 50 years say, he

25   would have to serve approximately 20 years before he could be

1    stepped down to a lower level facility.

2            So I think that also weighs of favor of sentencing

3    Mr. Lopez to a sentence that would still be significant, may

4    in fact result in a life sentence, but would allow him to be

5    properly designated in a facility where he can get treatment

6    not only for what is obviously a very severe issue, a mental

7    health issue, but also would provide him with the necessary

8    medical treatment going forward.

9            You know, there's the sort of an old Dostoevsky

10   quote that says that you can judge the degree of the

11   civilization in a society by entering its prisons and I think

12   anybody having entered the MDC during the last two years,

13   would certainly have questions about that.

14           Not just because of the punitive nature of the lock

15   downs, but sort of the ill repair and under staffing that's

16   gone on partly as a result of the pandemic, but partly as a

17   result of systemic issues that have occurred in the bureau of

18   prisons.

19           Though we certainly understand that Mr. Lopez has

20   not come close to beginning to serve what is an appropriate

21   sentence in this case, I think it should be acknowledged that

22   the last two and a half years have been extremely harsh in

23   terms of the excessive lock downs that have occurred within

24   the facility as well as the limitations on ability to

25   communicate with not only family and friends, but counsel and

1    just the general lack of conditions in terms of food, heating

2    and everything that inmates have experienced at the MDC.

3            And numerous judges as we cited in our sentencing

4    submission, have found that an appropriate reason for a

5    downward variance.

6            I think it's also important to look going forward

7    because what we've also seen is that the Bureau of Prisons is

8    now responding to various incidents with nationwide lock

9    downs.

10           I think the court may be aware that there was

11   recently an incident in Texas where two inmates were killed

12   and as a result, the bureau of prisons locked down the entire

13   country nationwide without exploring whether there was an

14   individualized threat at each facility.

15           The reason I point this out, is I think it tells

16   you what Mr. Lopez is likely to experience in the next

17   decades of his life in prison.

18           I don't think, although we hope to be out of the

19   woods in terms of the pandemic, I think it's likely that Mr.

20   Lopez will experience similar conditions wherever he gets

21   designated at various intervals throughout his incarceration.

22           I think the Dostoevsky quote is important for

23   another reason also, is I think it also instructs the court

24   that no matter how heinous the crime, no matter how horrible

25   the conduct, we still have to consider the individual and we

34

1    still have to -- prisons shouldn't be designed to torture

2    somebody, to hold them in inhumane conditions.

3            And I think for a man Mr. Lopez's age with his type

4    of conviction, sending him to a maximum security federal

5    penitentiary, may actually be that kind of treatment.

6            So for all of those reasons, we would ask the court

7    to consider sentencing Mr. Lopez downwardly varying and

8    sentencing Mr. Lopez to what it sees fit or what we're

9    constrained to ask for, which is 25 years as an aggregate

10   sentence.

11           THE COURT:  Thank you.  Two questions for the

12   defense.

13           First, what was the legal reason -- the legal basis

14   for vacating the plea in state court?

15           MS. GELERNT:  So the legal basis was that Mr. Lopez

16   had actually already been indicted here at the time of his

17   plea in state court.  He -- the prosecutor in Queens was

18   actually thanked in a press release here when the indictment

19   was obtained and his lawyer in the state never advised him

20   that he'd been indicted and he was never told that there were

21   other charges pending.  And based on that, my understanding

22   is that the district attorney agreed to allow him to vacate

23   his sentence.  It was also --

24           THE COURT:  On something like the basis that the

25   plea was not knowing and voluntary in the state court?

1          MS. GELERNT:  Yes.  I mean my position when I saw

2     that was that he had received ineffective assistance of

3     counsel.

4          THE COURT:  Right.

5          MS. GELERNT:  And I don't have -- I had the

6     document indicating that it was vacated and my understanding

7     is that the parties agreed to vacate the plea in advance of

8     an evidentiary hearing so I don't know whether it was

9     explored, you know, what obligation the Queens prosecutor had

10    to acknowledge that there were other charges pending at the

11    time that the plea was entered.  But I think, it's my

12    understanding that the parties agreed that it would be

13    appropriate to vacate that plea.

14          It's also my understanding that there is an overlap

15    of victims in this case and the charge of conviction there.

16    So -- and I think there was also an understanding at the time

17    that they agreed to vacate the plea, that Mr. Lopez would be

18    pleading guilty here and what type of sentencing he was

19    facing in this case.

20          And as we informed the court, it certainly had

21    impact on this case in terms of the mandatory minimums and

22    maximums for each crime and also if Mr. Lopez had gone to

23    trial, how that conviction could have been used in this case.

24    But that's something we didn't end up having to address.

25          THE COURT:  And then my last question is, you're

1    telling me that even if Mr. Lopez is to be incarcerated for

2    what is effectively the remainder of his life, the number of

3    years incarceration will still matter to the designation to a

4    maximum security prison, a medium security prison or

5    otherwise.

6            And that I think I heard you say that if we

7    sentence the 280 years, he'll be in maximum security

8    indefinitely.

9            If we sentence him to 25 or something like what

10   you're asking for, he would be likely to step down, I think

11   you said, from maximum to medium at some point.  I'm not

12   suggesting that I think this factor should carry the day at

13   all.

14           Obviously, there are aggravating and mitigating

15   factors here and some of the aggravating factors we'll talk

16   about in a moment, are extraordinary in many ways, but I just

17   want to make sure I understand mechanically what the -- so is

18   the -- if the step down is not something a defendant is

19   eligible for until 20 years or fewer remain on the sentence,

20   I take it the formula I should be working with is, take

21   whatever sentence is imposed and subtract 20 and if the

22   remaining number exceeds Mr. Lopez's life expectancy, then

23   that would be essentially a sentence to maximum security for

24   the remainder of his life.  Is that --

25           MS. GELERNT:  If I'm following Your Honor's math, I

37

1    apologize.  So my understanding from reading and reviewing

2    the BOP regulations, is that because Mr. Lopez is a

3    deportable non-citizen, which likely -- he was a legal

4    permanent resident and he's a Columbian citizen.  So it's

5    clear that based on the nature of these convictions, he's --

6              THE COURT:  Deportable.

7              MS. GELERNT:  -- deportable.  So my reading of the

8    bureau of prisons regulation, is that he's not eligible for a

9    waiver because of that and so individuals with 30 years

10   remaining on their sentence, have -- 30 or more remaining on

11   their sentence, have to be in a high security.  Between 20

12   and 30, it's medium and then under 20 they can get stepped

13   down.

14             THE COURT:  I see.

15             MS. GELERNT:  And it apparently from the bureau of

16   prisons regulations, there is -- if you're not eligible for a

17   waiver, which the non -- the deportable non-citizen isn't,

18   then there is no way to get out from under that.  And that's

19   based on their published regulations which I believe I cited

20   to the court.

21             So and I -- you know, and I guess the court started

22   to address what are the aggravating factors in this case and

23   in some ways I suppose I should touch on this.

24             We've been very circumspect in terms of not wanting

25   to lay any of the blame or causation on factors in Mr.

1    Lopez's life.

2            I think we directed the court to certain things

3    that happened to Mr. Lopez's life in terms of his

4    victimization both by his father in terms of physical abuse,

5    and by a very brutal incident of sexual abuse early in his

6    life.

7            I sort of felt that I didn't want to spend too much

8    time on those issues because I didn't think that in assessing

9    the appropriate sentence, that could nearly rise to the level

10   to explain the conduct and I wanted to make it clear that

11   neither myself nor Mr. Lopez really, were in any way trying

12   to excuse his conduct or negate the seriousness of the

13   conduct.

14           And so for that reason I also didn't submit letters

15   on his behalf from his family which really could be viewed by

16   the court as self-serving or failing to understand the harm

17   that he had caused.

18           I also think that to the extent that his family

19   sees him differently and that maintain a close relationship,

20   I think one of the insidious natures of this crime that I'm

21   sure the court will touch on and the government will touch

22   on, is it's that type of duality that allows somebody to

23   commit this type of crime, that allows them to gain trust.

24           And so I really wanted to focus on what I thought

25   were the important issues that I think the court still has to

1    consider.  Although the crime is horrible, although there can

2    be no excuse for Mr. Lopez's conduct.

3             So I think the court is still directed to think of

4    yes, Mr. Lopez may need to be incapacitated by this sentence.

5    He certain needs and should be punished by this sentence, but

6    it doesn't mean that the punishment should be inhumane which

7    I think sentencing him to a term of 100 years would result in

8    something that ultimately was inhumane and not worthy of the

9    type of punishment and consideration that we think of for

10   somebody of Mr. Lopez's age who will pose no danger while in

11   custody.

12            THE COURT:  Thank you.  Ms. Hajjar, do you want to

13   be heard?

14            MS. HAJJAR:  Thank you, Your Honor, yes.

15            The government is asking that the court impose an

16   effective sentence of life imprisonment in this case.

17            The guidelines in this case are as we've noted, a

18   base offense level of 51 which is literally off the charts of

19   the sentencing guidelines.  And that is really because the

20   crimes here are among the most serious under the law and are

21   recognized as such.

22            I'm not going to describe the offense conduct in

23   detail because I know Your Honor has read the government's

24   sentencing memorandum and it is set forth in detail there,

25   but this case is extraordinary in terms of the age of the

40

1      victims that were abused, the length of time in which the

2      abuse took place, the nature of the sexual acts that were

3      depicted in the child pornography that the defendant created,

4      and the number of children abused.

5              This is really the worst of the worst.  It is the

6      worst case that certainly that Special Agent Steeva has seen

7      in his career at the FBI and I as a prosecutor.  It is

8      extraordinary in terms of the length of time and the age of

9      the victims.

10             The defendant pled guilty to nine counts related to

11     the sexual exploitation of at least eight different victims,

12     but as the PSR notes, law enforcement seized over 13,000

13     files of child pornography depicting at least 28 different

14     victims.  The abuse took place over a decade and some of the

15     victims the defendant abused, that abuse began shortly after

16     their birth as infants.

17             As Your Honor knows, the government has been in

18     contact with the families of the victims in this case.  Some

19     have indicated they will not be attending the sentencing

20     because of the emotional toll and trauma that this case has

21     caused, but asked me to convey to the court the devastation

22     of the defendant's actions have caused them and their

23     children.

24             Child rape especially the prolonged abuse over

25     years that the defendant engaged in here, has unimaginable

1    impacts on a child.

2            It can destroy families and have long-standing

3    consequences on the child's development, the child's ability

4    to develop relationships in the future, their understanding

5    of trust, and in every sort of facet of their lives going

6    forward and not just the child, but the child's family as

7    well.

8            In particular the family member of additional

9    victims one and two have asked that I read a portion of the

10   victim impact statement, the lengthy statement that was

11   provided to the court and ask that I read it on their behalf.

12   May I do so?

13           THE COURT:  Yes.

14           MS. HAJJAR:  I'll refer to additional victim two as

15   Jane Doe just for the purposes of the statement.

16           Jane Doe's abuse started as a little girl and it

17   had just come to the attention of her father in February of

18   2021.

19           It took immense courage on Jane Doe's behalf to

20   come clean to her father about the tormenting secret she'd

21   been living with for years.  She described in detail the

22   abuse she had to face by this monster, Orlando Lopez.

23           Her father had no choice but to be strong for his

24   daughter, but the days following the information he found out

25   were grim beyond belief.  He was sick to his stomach for

42

1    days, vomiting uncontrollably, physically sick.

2              Her father blames himself for not being able to be

3    home to protect his daughter while he was working trying to

4    provide for his family.  He says if he was present at this

5    time, this wouldn't have happened to Jane Doe.

6              Since finding out the news, her father deals with

7    enormous guilt haunting him every single day.  He still

8    struggles with unanswered questions, doubts, a lot of

9    information that will always be debatable.

10             Her father has not been able to return to a stable

11   full time job as he feels it's important he never leaves Jane

12   Doe's side.  This has put a huge financial stress on the

13   family.

14             Every month we are struggling with bills because

15   her father has never been the same and will never been the

16   same.  While this information has created an unbreakable bond

17   between the two, it is something that he has not been able to

18   recuperate from.

19             The beginning of 2021 was a life-changing year for

20   our entire family as we had to move out of the state to New

21   Jersey because Jane Doe could not stand being in the same

22   apartment where the abuse occurred.

23             She describes being in the same bedroom where

24   Orlando would sexually abuse her and describes seeing this

25   monster in her nightmares every single night.  Jane Doe

43

1    needed a complete change of environment as she was also

2    experiencing trouble in school because of these events.

3         Jane Doe blamed herself for letting the abuse

4    continue for almost a year until her therapist and father

5    explained to her numerous times this was not her fault.

6         Jane Doe lives with the guilt of the other children

7    who were molested because she feels that if she had said

8    something sooner, she could have avoided the trauma others

9    are living with as well.

10        I personally almost lost my job because I had to be

11   in constant support for Jane Doe's father and Jane Doe.  I

12   had to calling out or coming in late because of all the

13   appointments Jane Doe had to attend to help her reach a

14   standard level of security for her everyday living.

15        It's unfortunate that any little girl must deal

16   with the overwhelming emotional stress due to the disgusting,

17   sickening acts of an elderly man who deserves to rot in

18   prison for the rest of his life.  It is unimaginable that a

19   repelling man's nauseating urges has caused irreversible,

20   irreparable, everlasting damage to our entire family.

21        He had his moments of pleasure while our little

22   girl is stained for the rest of her life.  Trauma we must

23   carry throughout our family including her younger siblings

24   over these life-changing events that no child should ever

25   have to deal with.  This monster does not have any idea of

44

1    the damage he has caused.

2            That's just an excerpt, Your Honor.  I know Your

3    Honor has the full victim impact statement which was also

4    quoted in the government's sentencing memorandum along with

5    several other victim impact statements.

6            And I think what these impact statements make clear

7    is that these victims and their families will be carrying the

8    damage of this abuse with them for the rest of their lives.

9            I'll just briefly address some of the points Ms.

10   Gelernt made today.

11           None of the factors Ms. Gelernt mentioned are truly

12   mitigating factors in the sense that they warrant any kind of

13   downward departure from the guidelines in this case in the

14   government's view.

15           First of all, there's nothing extraordinary about

16   the defendant's acceptance of responsibility in this case.

17   The plea agreement in this case was negotiated over a period

18   of months.

19           As part of the plea agreement, the defendant did

20   not plead guilty to count 1 which is the most significant

21   count which carried a 30 year mandatory minimum.

22           The government agreed to this plea agreement -- to

23   a plea agreement that did not carry a plead to the top count

24   in order to spare victims the trauma of having to go through

25   a trial in which their testimony would be necessary.

1              But the defendant's plea of guilty is not an

2      extraordinary acceptance of responsibility beyond the

3      acceptance of responsibility that's attended to every plea of

4      guilty before Your Honor.

5              Of course it saves the government resources in

6      terms of having to have a trial and it spares victims from

7      having to testify at trial, but that's no different from any

8      other plea of guilty.  This is not a situation where we're

9      talking about a cooperator.

10              This is not a situation in which the defendant came

11      forward before charges were brought and negotiated a plea to

12      an information or anything like that.

13              This was a run of the mill plea negotiation where,

14      of course, the government -- there were certain severe counts

15      the government did not ask the defendant to plead guilty to

16      as a result of the plea agreement.  Yes, and the government

17      negotiated that the defense would not seek a sentence below

18      25 years as part of that negotiation.  But again, none of

19      this takes it outside the scope of the ordinary in terms of

20      acceptance of responsibility.

21              THE COURT:  Can I just get your views of the

22      institutional dynamics that Ms. Gelernt invoked.  I mean, I

23      understood her analogy, such as it was, to the 5K context to

24      be a suggestion that there's some degree here to which

25      leniency might be in the government's interest, the

1  prosecution's interest in the sense that when you have a

2  defendant who is, you know, subject to life incarceration

3  before the guilty plea and still subject to life imprisonment

4  under the guidelines after the guilty plea, right?

5          The three points for acceptance of responsibility

6  are a rounding error or less in this case, that there's very

7  little incentive to plead, right?

8          And that therefore the nature sort of path of least

9  resistance for similarly situated defendants, might be to put

10  the system to the burden of a trial and more -- much more

11  importantly to put the victims through the secondary harm

12  that that might entail.

13          I'm not pushing you on this one way or the other at

14  all, I'm just asking institutionally, do you think there's

15  anything to that view or do you disagree entirely?

16          MS. HAJJAR:  I think the incentives become

17  complicated for defendant's where a defendant is facing a

18  life sentence.

19          However, this is different from a murder trial in

20  terms of the costs of the defendant himself from going

21  through a trial like this and the attendant publicity.

22          I would say there are -- there is incentives and

23  there's value for the defendant as well in terms of ending

24  and resolving this case quickly and moving to sentencing.

25          Of course, having -- not having sitting through the

1    testimony of small children that he has abused for 10 years,

2    I think there is value to a defendant in avoiding that.

3         That may not be the case for every defendant and I

4    certainly, I don't think I've thought enough about this in

5    terms of institutionally for every defendant, but certainly I

6    think there is value on both sides for a quick resolution.

7    It wasn't quite quick in this case, but it was negotiated and

8    I think it was in the interest of both parties to resolve it

9    this way.

10        THE COURT:  That's helpful.  Thank you.

11        MS. HAJJAR:  With respect to a few other things

12   that Ms. Gelernt mentioned, I don't think from the

13   government's perspective, the BOP regulations or designations

14   should play any part in the court's determination of the 3553

15   act factors.

16        And in terms of the defendant's age, I know Ms.

17   Gelernt has mentioned a number of times that the defendant is

18   66 years old now.

19        I'll just note Your Honor, that this is not a crime

20   -- the nature of this crime is not one for which advanced age

21   incapacitates the defendant from continuing to commit these

22   types of crimes in the future.

23        The defendant was 52 years old when he first

24   started sexually abusing Jane Doe two who was an infant at

25   the time.  He was 63 years old when he took Jane Doe one to

48

1    New Jersey in order to abuse her.  That was in 2018.  The

2    defendant's age clearly has not prevented him from committing

3    crimes, far from it.

4         If the defendant had not been arrested, he would be

5    committing the same crimes today and tomorrow and in the

6    perceivable future.  The defendant's advancing age has

7    clearly not had an impact or has not incapacitated him from

8    committing the crimes in this case.  And so in the

9    government's view, a sentence of life imprisonment, an

10   effective life imprisonment is necessary and warranted under

11   the 3553(a) factors to ensure the safety of the community and

12   to provide just punishment in this case.

13        THE COURT:  Thank you.  Just one more question.

14   How old, if you know, is the oldest victim now?

15        MS. HAJJAR:  Right now?

16        THE COURT:  Is anybody -- my question more broadly

17   is just are any of the victims here even close at this point

18   to the age of majority?

19        MS. HAJJAR:  No.

20        THE COURT:  Okay.  And I ask the question just to -

21   -

22        MS. HAJJAR:  I'm sorry.  I just want to -- I'm

23   sorry.  Just in response to Your Honor's question, all --

24   none of the victims are close to the age of majority.

25        THE COURT:  Yeah.  The context for my question is

1    the realization, maybe a belated realization on my part, that

2    in addition to the many other ways, the so many other ways,

3    that you know, child exploitation is different from

4    commensury conduct with adults.

5         One of them is that victims loose the opportunity

6    that the system tries to accord other victims to participate

7    in the proceedings in some meaningful way to be heard in

8    these proceedings, in some meaningful way they're just too

9    young still to be expected to even fully understand what's

10   going on here, let alone participate in any meaningful way.

11        And we've seen cases involving adults in this

12   courthouse in recent years, high profile cases involving

13   sexual assault, maybe in which you've also been the

14   prosecutor, I'm not sure.

15        But I just -- you know, as a spectator to those

16   cases I think it's fair to say that a judge does not need a

17   PhD in psychology to observe that there's a reason why the

18   system tries to accord victims the rights that it does, to be

19   heard in these proceedings because there is some, however

20   small, some cathartic affect potentially associated with

21   being able to speak on one's behalf and that's obviously --

22   that's not present here in the same way.

23        MS. HAJJAR:  And I'll just add, Your Honor if I

24   could, that one thing I didn't mention in my remarks is that

25   some of this child pornography has also been distributed.

1    Some of the pornography the defendant created.

2              And while maybe the distribution of that

3    pornography pales in comparison to the act of child rape

4    which is in terms of the harm to the victim, the knowledge of

5    the distribution of child pornography, the fact that one's

6    images and videos of these horrible moments are shared with

7    other individuals.

8              In at least in my experience having seen victim

9    impact statements of children who have grown up without

10   understanding in that realization that there's been a market

11   made of their -- of images of their exploitation and the harm

12   and recurring harm that that causes, it is extraordinary and

13   just cannot be put into words.

14             And so I note that too that it's not simply the

15   harm looking backwards, but prospective harm as a result of

16   the distribution of images created of these children's

17   exploitation and abuse.

18             THE COURT:  Yes.  Thank you.  Ms. Gelernt, I'm

19   going to, at this point, offer Mr. Lopez of course, the

20   opportunity to speak on his own behalf.  We can do that

21   either straight away or if you want a five minute break, we

22   can do that too.

23             MS. GELERNT:  I believe he has a prepared written

24   statement that he's written in Spanish and I've provided the

25   interpreter with a copy so that he can follow along and

51

1      translate more fluidly.

2              And just to briefly respond to one of the questions

3      that the court asked of the government about whether a

4      defendant facing life sentence before the plea and after the

5      plea would have an incentive to plead, I think the court

6      phrased the issue perhaps more succinctly and eloquently than

7      I tried to in my remarks.

8              But I would also add it's not only for the

9      defendant making the decision.  It's defense counsel.  So the

10     effect on defense counsel trying to advise clients in the

11     future, whether there's any benefit to pleading, is also

12     implicated by the sentence that the court imposes.

13             THE COURT:  Understood.  Can we just make sure

14     before we begin that the microphone is close to hand for Mr.

15     Lopez and more importantly, actually, the interpreter.

16             MS. GELERNT:  Oh, yeah, that's true.

17             THE DEFENDANT:  Can you hear me?  Your Honor, I

18     would like to apologize to the government of the United

19     States and especially to the City of New York for my shameful

20     acts.

21             I deeply regret the harm, pain and suffering that I

22     caused to these children and to their families.  The

23     suffering and the hardships that I suffered during my

24     childhood do not justify the harm that I've caused them with

25     my horrible acts and I am deeply sorry for having betrayed

52

1    the trust that the parents of these poor children put on me.

2           I am also sorry for the pain and suffering and

3    shame that I've caused to my own family.  In taking the

4    decision to plead guilty and to take responsibility for my

5    criminal actions, I hope that I can rid these children and

6    their families of the pain and suffering that they would

7    suffer during a public trial.

8           I do understand that there is nothing that I can

9    say or do that could repair or erase the pain that I've

10   caused, but I hope that my sentence would bring some sense of

11   closure to the victims and to their families.  With all due

12   respect, Your Honor, Orlando Lopez.  Thank you.

13          THE COURT:  Thank you.  All right.  At this point I

14   will take a ten or maybe even slightly longer minute break

15   and we will reconvene shortly.

16          (Court in recess from 4:01 p.m. until 4:14 p.m.)

17          THE COURT:  Please be seated.  Are we ready to

18   proceed?

19          MS. HAJJAR:  Yes, Your Honor.

20          MS. GELERNT:  Yes, Your Honor.

21          THE COURT:  Okay.  We're back on the record after a

22   short break that I've used just to collect my thoughts on the

23   arguments from the parties and the statement from the

24   defendant.

25          I've adopted the pre-sentence report in it's

1    entirety.  I've reviewed and considered the sentencing

2    guidelines in this case.  I've also considered extensively

3    the relevant factors set out by the United States Congress at

4    18 U.S. Code, Section 3553(a), which include the advisory

5    guidelines range.

6              In order to ensure that I impose a sentence that is

7    sufficient but not greater than necessary to comply with the

8    purposes of sentencing, which in this and every case include

9    the need for the sentence to reflect the seriousness of the

10   crime, to promote respect for the law, to provide just

11   punishment for the offense, and to deter criminal conduct by

12   Mr. Lopez specifically, and also by other individuals who

13   might seek to engage in this type of crime.

14             I've also, of course, considered the nature and

15   circumstances of the offense conduct in this case and the

16   history and characteristics of the defendant.

17             And just to summarize where the various sentencing

18   data points and recommendations are in this case, the

19   statutory maximum in the aggregate as the defense has pointed

20   out is 280 years in jail.  That's 30 years for each of the

21   nine sexual exploitation counts and ten years for the child

22   pornography conviction.

23             The plea agreement between the parties projected

24   the guidelines at life imprisonment and the government seeks

25   a guidelines sentence.  The defense has requested a sentence

54

1    of 300 months or 25 years or such a sentence as the court

2    might otherwise find appropriate and the United States

3    Probation Department has recommended a total of 50 years

4    consecutive incarceration for Mr. Lopez.

5           As I looked through my notes moments ago, I was

6    struck that much of what I've written down here is repetitive

7    of arguments the government has made and in many cases

8    repetitive of acknowledgments the defense has made about the

9    severity of the criminal conduct at issue here.  But I think

10   it's worth, given the extraordinary nature of this course of

11   conduct, acknowledgment by me nevertheless.

12          And I start with some quantitative observations as

13   the government did.  I observed that the number of children

14   involved in this case is high, exceptionally high.  Not just

15   the victims referenced by name or pseudonym in the

16   indictment, but also as indicated by the pre-sentence report

17   at paragraph 23, it is the case that forensic analysis of the

18   defendant's devices showed that he produced, if I understand

19   this correctly, child pornography depicting at least 28

20   victims, only 15 of whom have been identified.

21          MS. HAJJAR:  That's correct, Your Honor.

22          THE COURT:  So that prompts for me the

23   extraordinary realization that there may be a large number of

24   children out there who were abused by Mr. Lopez, and as to

25   whom no adult in the world other than Mr. Lopez himself, is

55

1    aware of the abuse, so that any opportunity that an adult

2    might have to deal with the victimization of those children

3    as best they could through therapy or otherwise, we simply

4    don't know who knows what and to what degree those children

5    have any adult in their life with whom they're in

6    conversation about this conduct.

7            The pre-sentence report notes as to the additional

8    victims that they cannot be grouped under the sentencing

9    guidelines or considered relevant conduct and, therefore, to

10   the extent we're talking about the guidelines, which we're

11   really not here given the life range, that would be a basis

12   for an upward departure under the guidelines if anything.

13           The number of images in this case is extraordinary.

14   There were 13,000 files recovered from the defendant's

15   premises that the government believes were produced by the

16   defendant and that's separate and apart from other images he

17   downloaded, what the pre-sentence report is calling the

18   commercial images.

19           Do I have that number correct?

20           MS. HAJJAR:  That's correct, Your Honor.

21           THE COURT:  That's an extraordinary number of

22   files, it should go without saying.  More importantly than

23   the numbers is, of course, the content of the images.

24           And the content of the images has been described at

25   some length in the pre-sentence report and in the

1    government's submission and somewhat more obliquely here

2    today on the record.

3            I don't want to go into too much detail here in

4    court, but given that we're making a record for posterity

5    here, including perhaps a record that will be read by victims

6    themselves one day, I think it's important for the record to

7    reflect that all of us here in this courtroom today were

8    aware, especially the advocates and the decision maker in

9    this courtroom here today, were aware of the extent and

10   severity of the sexual exploitation activity at issue here

11   today.

12           Suffice it to say in that respect that we are

13   talking about extraordinarily graphic depictions of Mr. Lopez

14   performing sexual acts on children and forcing them to do so

15   on him.

16           And so that we are crystal clear about that, we are

17   talking, as the government acknowledged, about the outright

18   rape of children among other things.

19           In some cases the victims were forced by Mr. Lopez

20   to perform these acts not only with him, but with other

21   children including at times siblings.

22           I'll stop there, but the narrative recitation of

23   what we're dealing with in these images, there are not really

24   words to describe other to invoke trite phrases like it

25   shocks the conscience.  It genuinely does shock the

1      conscience.

2              And then there's the duration of the scheme.  The

3      earliest victims identified in this case date back to 2011.

4      I don't think anybody sitting in this room other than Mr.

5      Lopez knows with confidence whether and how much earlier the

6      type of conduct we are talking about here predates the

7      conduct described in the indictment.

8              I've only been a judge in this courthouse for two

9      years now and in that -- even in that short period of time,

10     I've seen a lot of the darker side of humanity as we do in

11     federal courts, but this case is in a category of its own.

12     The suffering and the corresponding loss of innocence to

13     these child victims are incalculable.

14             There is no way that I can articulate that better

15     than the victim statements do.  They speak to the depression

16     that these child victims are living with, the fear, the loss

17     of self-esteem, the inability to enjoy everyday life, the

18     obstacles to physical and emotional intimacy with which these

19     victims will have to struggle forever.  The nightmares, the

20     body image issues.

21             One victim was said by her guardian to be disgusted

22     by her own body and I think we can all acknowledge that she

23     is describing a particularly excruciating kind of torture

24     that in all likelihood will endure for that victim long after

25     Mr. Lopez is gone from this earth.

1          The guilt that one victim described that if she had

2     spoken up sooner, other victims might not have been harmed.

3     And ultimately the suicidal ideation and just imagine that

4     for a second.  That we're talking here about conduct that

5     caused a child so much suffering that she would prefer to be

6     dead than alive.

7          There are secondary consequences to others beyond

8     the immediate victims as the government also pointed out.

9     Obviously most notably, the parents.  They have to struggle

10    with their own guilt for things so ordinary as leaving a

11    child to go to work.  And more than one parent described on-

12    going problems of their own in getting and maintaining work

13    given what they feel to be the persistent need to be near

14    their children every day now.

15         So that's the aggravating factors.  As in every

16    case, every criminal case in every courthouse anywhere in the

17    world there are factors to be weighed on the other side of

18    the scale.  And defense counsel has articulated them.

19         It is true that Mr. Lopez accepted responsibility

20    relatively early on in these proceedings and that he did

21    spare the victims the burden of sitting through a trial or

22    otherwise getting engaged.

23         The record doesn't really reveal much, it seems to

24    me, in the way of alternative paths given the video and

25    documentary evidence.  It's not really obvious that Mr. Lopez

59

1    had much of an alternative but to plead guilty, but still the

2    decision to spare the victims a trial does count for

3    something.

4         Perhaps more importantly, and I know defense

5    counsel didn't want to get into this at long length, but I do

6    want to note that Mr. Lopez recounts in the defense

7    submission being the victim of sexual abuse himself as a

8    child at the hands of a man that the defense has identified

9    as a friend of the defendant's father.

10        Mr. Lopez also recounts being physically abused by

11   his father when he spoke up about this incident.  And I do

12   not -- I want to make clear, I do not discount the potential

13   horror of that or the precipitating role that it may -- may

14   have played in the broader conduct at issue here.

15        But it simply does not in any way for the most

16   obvious reasons excuse the conduct at issue here.  And given

17   the aggravating factors that I've described, it is hard to

18   see what substantial role, if any, that history can play at

19   sentencing in light of the 3553(a) factors that I've

20   described.

21        At this point in his life, simply put, Mr. Lopez

22   has revealed himself through his conduct, to be the person

23   who he is and the record reveals absolutely no indication

24   that he sought help for the, you know, what the defense has

25   described as the mental health overlay in this case.

1          But putting all that aside, the need for deterrents

2    in this case, both specific deterrents and general

3    deterrents, compel me -- compel me, I believe, to ensure that

4    Mr. Lopez will serve what will effectively be in the

5    aggregate a life sentence regardless of how long he lives.

6          I am sensitive to the designation issues raised by

7    the defense.  I asked the follow up question that I did about

8    where the dividing line might be between a sentence that

9    would render him eligible perhaps for a step down in security

10   designation and the sentences that would not.

11         But I conclude having heard what we've heard about

12   that, that the conduct in this case simply places us too far

13   from that borderline, whatever it might be, to merit taking

14   that into account in a dispositive way in this case.

15         And so having said all that and after assessing the

16   particular facts of this case and in light of the relevant

17   Section 3553(a) factors, I sentence Mr. Lopez to the

18   following:  25 years in the custody of the attorney general

19   on each of counts 2, 4, 5 and 6, to run concurrently to one

20   another and 25 years on each of counts 7, 8, 9, 10, and 11,

21   that later group of counts to run concurrently to one

22   another, but consecutively to counts 2, 4, 5 and 6, the first

23   grouping of counts.

24         And I also sentence Mr. Lopez to five years on

25   count 12, the child pornography count to run consecutively to

1    all of the other counts in this case.

2          I agree with the government that that creation and

3    distribution of the child pornography images of the victims

4    here is a separate harm and one that will continue to impact

5    the lives of the victims here long after the sexual abuse in

6    this case is, you know, the dates of the sexual abuse are in

7    the past.

8          So by my calculation when you look at what -- which

9    terms of imprisonment that I just mentioned on which counts

10   run consecutively to which others, you end up with a total of

11   55 years of incarceration.

12          Does the government have any questions about the

13   calculations that I've just made?

14          MS. HAJJAR:  No, Your Honor.

15          THE COURT:  Does the Probation Department?

16          THE PROBATION DEPARTMENT:  No, Thank you, Your

17   Honor.

18          THE COURT:  Does the defense have any mechanical

19   calculations just about how that works?

20          MS. GELERNT:  I don't have mechanical calculations

21   about how that works, Judge.

22          The only thing that I would add is that because of

23   the nature of Mr. Lopez's custody on this case, and with the

24   sentence of 55 years, this is really not the most paramount

25   issue, but I would ask that the judgment indicate that it

1    began running from October 30th of 2019, so that he's

2    credited for all of the time he's actually served in on this

3    case.

4              THE COURT:  I would have anticipated that that

5    would happen automatically, but --

6              MS. GELERNT:  There are issues regarding who has

7    primary jurisdiction --

8              THE COURT:  Oh, state versus -- okay.

9              MS. GELERNT:  -- state jurisdiction, so I would

10   just ask that that date be reflected in the judgment.

11             THE COURT:  Does the government have any objection

12   to that?

13             MS. HAJJAR:  No, the government takes no view on

14   that.

15             THE COURT:  Okay.  So I'm sorry, say the date

16   again?

17             MS. HAJJAR:  It's October 30th of 2019.

18             THE COURT:  And that's the first day of state

19   custody in this case?

20             MS. HAJJAR:  Yes, Your Honor.

21             THE COURT:  Okay.  The judgment will so indicate.

22   In terms of supervised release, I sentence Mr. Lopez to five

23   years of supervised release on each count all to run

24   concurrently to one another.  He shall be subject to all

25   mandatory conditions of supervised release and too, the

63

1    following special conditions suggested by the probation

2    department.  Just bear with me one second.

3              So pursuant to 18 U.S. Code, Section 4042(c), as in

4    Charlie, Mr. Lopez shall be subject to the sex offender

5    registration provisions in the United States Code.

6              He shall register and keep the registration current

7    in each jurisdiction where he resides, where he's employed,

8    or where he may be a student.

9              And for initial registration purposes only, he

10   shall register in the jurisdiction in which he is convicted

11   if that jurisdiction is different from the jurisdiction of

12   his residence.  I don't believe that to be the case.  Hold on

13   just one second.

14             MS. GELERNT:  That is not the case, Your Honor.

15             THE COURT:  Yeah.  The defendant shall refrain from

16   contacting the victims of the offenses here.  This means he

17   shall not attempt to meet in person, communicate by letter,

18   telephone, email, the internet, directly or indirectly,

19   including through any third party, without the advance

20   knowledge and written permission of the United States

21   Probation Department.  No contact with the victims.

22             The defendant shall participate in mental health

23   treatment programming, which may include participation in a

24   treatment program for sexual disorders, as approved by the

25   Probation Department.  Defendant shall contribute to the cost

64

1    of such services rendered and/or any psychotropic medications

2    prescribed to the degree that he is able and shall cooperate

3    in securing any applicable third party payment.

4          The defendant shall disclose all financial

5    information and documents to the Probation Department to

6    assess his ability to pay and as part of the treatment

7    program for sexual disorders, the defendant shall participate

8    in polygraph examinations and/or visual response testing to

9    obtain information necessary for risk management and

10   correctional treatment.

11         The defendant shall not associate with children

12   under the age of 18 unless a responsible adult is present and

13   the defendant has prior written approval from the probation

14   department.

15         Prior approval does not apply to contacts which are

16   not known in advance by the defendant where children are

17   accompanied by a parent or guardian or for incidental contact

18   in a public setting.

19         Any such non-pre-approved contact with children

20   must be reported to the Probation Department as soon as

21   practicable but no later than -- excuse me, than 12 hours

22   following such conduct -- such contact.

23         Upon commencing supervision, defendant shall

24   provide to the Probation Department the identity and contact

25   information regarding any family members or friends with

1    children under the age of 18 whom the defendant expects to

2    have routine contact with so that the parents or guardians of

3    these children may be contacted and the Probation Department

4    can approve routine family and social interactions such as

5    holidays and other family gatherings where such children are

6    present and supervised by parents or guardians without

7    individual approval of each such event.

8            If the defendant co-habitates with an individual

9    with who has minor children, the defendant shall inform that

10   other party of his prior criminal history concerning the sex

11   offenses of which he has been convicted.

12           Moreover, he will notify that party of his

13   prohibition on associating with any children under the age of

14   18 unless a responsible adult is present.

15           The defendant shall submit his person, property,

16   house, residence, vehicle, papers, and computers, as defined

17   in 18 U.S. Code, Section 1030(e)(1), other electronic

18   communications or data storage devices or media, or office,

19   to a search conducted by a United States Probation Officer.

20   Failure to submit to a search may be grounds for revocation

21   of release.

22           The defendant shall warn any other occupants that

23   the premises may be subject to searches pursuant to this

24   condition.  An officer may conduct the search pursuant to

25   this condition only when reasonable suspicion exists that the

1    defendant has violated a condition of his supervision and

2    that the areas to be searched contain evidence of that

3    violation.  Any such search must be conducted at a reasonable

4    time at in a reasonable manner.

5                As the next special condition, the defendant shall

6    cooperate with and abide by all instructions of immigration

7    authorities and if deported or excluded, the defendant may

8    not re-enter the United States illegally.

9                Does that cover the special conditions recommended

10   by the Probation Department?

11               THE PROBATION DEPARTMENT:  It does, Your Honor.

12   Thank you.

13               THE COURT:  Okay.  Does the government have any

14   other requests in respect of special conditions?

15               MS. HAJJAR:  No, thank you, Your Honor.

16               THE COURT:  Okay.  I do in addition to the special

17   conditions I've just indicated as conditions of supervised

18   release, order forfeiture in this case.  I think I've already

19   executed a preliminary order of forfeiture?

20               MS. HAJJAR:  That's correct, Your Honor.  I have a

21   copy if you just want to pronounce it as final.

22               THE COURT:  Is there any objection from the

23   defense?

24               MS. GELERNT:  There's no objection, Your Honor.

25               THE COURT:  Okay.  Then I do now pronounce that

67

1    preliminary order of forfeiture to be final.

2              I will not impose a fine in this case because I

3    find based on the pre-sentence report, that Mr. Lopez lacks

4    the ability to pay a fine.

5              But I will impose restitution today in the amount

6    of $24,000 total.  And is there -- well, let me pronounce

7    this on the record so that the record is complete.

8              That restitution shall consist of $3,000 each to

9    the victims who have been identified by the pseudonyms Erin

10   and Fiona, who are depicted in the series Blues Pink 1,

11   $3,000 to Jane of the series Cinderblock Blue, $3,000 to

12   Jenny of the series identified as Jenny, $3,000 to Jessica

13   from the series identified as Jessica, $3,000 to the victim

14   identified by the pseudonym Amy who is depicted in the series

15   identified as Misty, and $3,000 to Raven, who is depicted in

16   the series Teal&Pinkprincess2, and $3,000 for Tara who is

17   depicted in the series identified as Tara.

18             I will also, to the extent any other victims

19   deserving a restitution are identified, hear from the

20   government on the subject of restitution for 90 days from the

21   date, I believe, on which the judgment formally issues.

22             And I think the defense has indicated in the plea

23   agreement and again here today, that you consent to the order

24   of that restitution. Is that correct?

25             MS. GELERNT:  Yes, Your Honor.

68

1          THE COURT:  Okay.  I am obligated by law to impose

2     a special assessment of $100 for each count of conviction and

3     I do so now.

4          I find that the sentence that I have just imposed

5     is sufficient, but not greater than necessary to comply with

6     the purposes of sentencing that we have discussed here today.

7          Does the government have a motion with respect to

8     any counts that you seek to dismiss?

9          MS. HAJJAR:  Yes, Your Honor.  The government now

10    moves to dismiss any open counts in the indictment.

11         THE COURT:  Okay.  I think that's count 1 and count

12    3 of the indictment and that motion is granted.

13         Mr. Lopez, let me advise you of your right to

14    appeal.  You can appeal your conviction if you believe that

15    your guilty plea was somehow unlawful or involuntary or if

16    there is some other fundamental defect in the proceedings

17    that was not waived by your guilty plea.

18         And under some circumstances a defendant also has

19    the right to appeal his sentence.  Any notice of appeal must

20    be filed within 14 days of the entry of judgment in this case

21    or within 14 days of the filing of a notice of appeal by the

22    government, whichever comes later.

23         If you request, the clerk of the court will prepare

24    and file a notice of appeal on your behalf and if you cannot

25    afford to pay the cost of an appeal, or for appellate

69

1          counsel, you have the right to apply for leave to appeal *in*

2          *forma pauperis*, which is a status pursuant to which the court

3          would waive the filing fee and on appeal, you would

4          potentially be eligible for court appointed counsel.

5                    In terms of sealing, I think we discussed, but let

6          me just make clear on the record here, that I do order Court

7          Exhibit 1 sealed and covered by the sealing order that is

8          already in effect in this case subject to the discussion

9          we've had on the record today about the circumstances in

10         which the defense may share it with state -- with Mr. Lopez's

11         state court defense counsel.

12                   Finally, I respectfully direct the court reporter

13         to produce a transcript of today's proceeding.

14                   Ms. Hajjar, are there any other matters to resolve

15         in this case?

16                   MS. HAJJAR:  I don't believe so except that Officer

17         Fisher just wanted the record to be clear and I agree with

18         her that it's prudent to do so that the $24,000 in

19         restitution that the court has imposed is specifically in

20         connection with count 12, which is the possession of child

21         pornography count and should the clerk's office have any

22         issues in terms of executing any monies that come in through

23         that, of course we have those addresses and will be able to

24         provide them to the clerk's office.

25                   THE COURT:  Yes, thank you for the clarification.

1    That restitution, the $24,000 in restitution is indeed

2    ordered in connection with count 12, the child pornography

3    count.  And yes, the clerk's office will have access if

4    needed to Court's Exhibit 1, though it remains under seal and

5    also of course can be in communication with the government as

6    necessary.

7              MS. HAJJAR:  Thank you, Your Honor.

8              THE COURT:  Ms. Gelernt, anything else?

9              MS. GELERNT:  Your Honor, the only additional

10   matter is that we'd ask that the court recommend that Mr.

11   Lopez be designated to a facility as close to the New York

12   area as possible to facilitate family visitation.

13             And I would just state for the record that my

14   office will, should Mr. Lopez choose to file a notice of

15   appeal, it's our practice to file the notice on his behalf.

16             THE COURT:  Okay.  And yes, I do recommend to the

17   Bureau of Prisons that Mr. Lopez be designated to a facility

18   as close to New York City as possible.  That recommendation

19   is not binding on them (coughing) -- excuse me, but I'd make

20   it for what it's worth.

21             All right.  That concludes today's proceedings.

22   Hold on just one second.

23             So it's being helpfully pointed out to me that I

24   should set a schedule for the payment of restitution and that

25   the schedule shall be that Mr. Lopez is to pay $25 per

1    quarter while he's incarcerated and employed or half of his

2    prison earnings, whichever number is greater, during the

3    period of his incarceration.

4            All right.  With that we've concluded today's

5    proceedings.  We're adjourned.

6        (Proceeding concluded at 4:49 p.m.)

7            I, CHRISTINE FIORE, court-approved transcriber

8    and certified electronic reporter and transcriber, certify

9    that the foregoing is a correct transcript from the official

10   electronic sound recording of the proceedings in the above-

11   entitled matter.

12

13   *Christine Fiore*

14   _____        May 7, 2022

15       Christine Fiore, CERT-410

16       Transcriber

17

18

19

20

21

22

23

24

25